## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

TRAVIS ROE,

     Plaintiff,

v.                                                    Case No. 3:22-cv-971-MMH-LLL

HOWARD E. FRYER, in his
individual capacity, et al.,

     Defendants.

_____

## O R D E R

**THIS CAUSE** is before the Court on Defendants' Motion for Summary Judgment, Statement of Facts, and Memorandum of Law (Doc. 106; Motion), filed by Sheriff Michelle Cook, Deputy Clint Redmond, and Deputy Mark Maertz (collectively "Defendants") on June 28, 2024.[1] Plaintiff Travis Roe filed a response on July 16, 2024. See Response to Defendants' Motion for Summary Judgment, Statement of Facts, and Memorandum of Law (Doc. 110; Response). Defendants did not file a reply. Accordingly, this matter is ripe for review.

_____

[1] The Court granted Defendants leave to file a consolidated motion for summary judgment. See Order (Doc. 105), entered June 25, 2024.

## I.   Background[2]

In November of 2019, Stephen Perry was brutally beaten to death. See Declaration of Director David Barnes at 48 (Doc. 107-1; Barnes Declaration). After an investigation into the murder by the Clay County Sheriff's Office (CCSO), a Clay County Circuit Judge issued a warrant for the arrest of Travis Roe. Id. at 48–50. Deputies Clint Redmond and Mark Maertz (the "Deputies"), amongst others, were tasked with effecting the arrest as members of the CCSO's SWAT team. See Deposition of Deputy Clint Redmond at 10–11 (Doc. 107-12; Redmond Deposition); Deposition of Sergeant Mark Maertz at 17–18 (Doc. 107-19; Maertz Deposition). Prior to executing the warrant, the CCSO held an operational briefing to discuss how Roe would be safely arrested. See Redmond Deposition at 10; see also Clay County Sheriff's Office Operational Plan (Doc. 107-2; Operational Plan). During this briefing, the Deputies were advised that Roe was wanted for beating Perry to death with a blunt object. See Redmond Deposition at 11. The Deputies also were advised that Roe had multiple felony convictions, was "a member of the Arian [sic] Brotherhood," was known to carry a Tec-9 submachine gun and other weapons on his person or in his vehicle, and that he and his family had a strong hatred

---

[2] Unless otherwise noted, the facts recited herein are undisputed. For the purpose of summary judgment, the Court views all disputed facts and reasonable inferences in the light most favorable to Roe; however, the Court notes that these facts may differ from those ultimately proved at trial. See Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (describing the summary judgment standard).

toward law enforcement. Id. at 11–12; Operational Plan at 2. Due to these facts, the plan was for the Deputies to surveil Roe at his home and conduct a pre-planned felony traffic stop after he left his house. See Redmond Deposition at 17.

Following the briefing, on August 27, 2020, the CCSO set out to execute Roe's arrest warrant. See Barnes Declaration at 50. Aided by surveillance from a U.S. Customs and Border Patrol helicopter, the Deputies were notified that Roe was driving toward the High Ridge Estates area. See Redmond Deposition at 21.[3] With Roe confirmed to be on the move, the Deputies initiated their effort to intercept him. Id. Deputy Redmond, who was driving an unmarked vehicle, was able to positively identify Roe. Id. He then activated his emergency lights and attempted to effect a felony traffic stop. Id. at 25. But, Roe did not pull over, and instead began to flee at a "high rate of speed." Id. at 25–26 (alteration omitted).[4] Following behind Roe, Deputy Redmond attempted to "conduct a PIT

---

[3] The helicopter was equipped with a camera that captured some, but not all, of the events alleged to have occurred. See Video From U.S. Customs and Border Patrol Helicopter (Doc. 107-3; Aerial Footage).

[4] Roe contends that he did not willfully flee from the Deputies because he was not aware that it was law enforcement who was attempting to pull him over. See Deposition of Travis Roe at 28 (Doc. 107-15; Roe Deposition) ("**Q:** And during that route, what is the first time you were aware that law enforcement was behind you? **A:** I didn't see any law enforcement behind me. **Q:** Until what time? **A:** There was never no law enforcement behind me."). Even if the Court were to accept Roe's characterization, the Court must analyze a reasonable officer's perception of Roe's conduct, not Roe's actual intent. See Jones v. Michael, 656 F. App'x 923, 929–30 (11th Cir. 2016) (the Court must analyze how the situation could "have been perceived to be by a reasonable officer, even if the reasonable perception was mistaken in the ultimate sense"). Upon review of the Aerial Footage, the Court finds that a

technique" on Roe's vehicle. Id. at 27.[5] The PIT was unsuccessful, however, and Roe was able to maintain control of his vehicle and continue fleeing. Id. at 28. Roe continued to drive away at a "high rate of speed," and started leading the Deputies toward his parent's house. Id. at 28–29.[6]

Once at his parent's house, Roe slowed his vehicle down, and started to turn into the driveway. Id. at 31. As Roe was making this turn, Deputy Redmond drove into the rear of Roe's vehicle in an attempt to immobilize it. Id. Once hit, Roe's vehicle came to a complete stop, and Roe "abruptly [got] out of his vehicle" and started walking toward Deputy Redmond. Id. at 32.[7] In response, Deputy Redmond got out of his vehicle and pointed his gun at Roe. Id.

---

reasonable officer could have believed that Roe was attempting to flee when he failed to pull over and continued to drive away. See Aerial Footage at 23:40–25:00. This is true even if Roe was unaware that it was law enforcement who was seeking to stop him.

In citing to Jones, the Court notes that it does not rely on unpublished opinions as binding precedent, but that they may be cited in this Order when the Court finds them persuasive on a particular point. See McNamara v. GEICO, 30 F.4th 1055, 1060–61 (11th Cir. 2022); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36–2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

[5] "The PIT ('Precision Immobilization Technique') maneuver is a technique used by law enforcement officers to stop fleeing vehicles. To execute the PIT maneuver, an officer matches the speed of the fleeing vehicle with his patrol car and taps its left or right rear bumper, causing the vehicle to spin out." Calhoun v. Warden, Baldwin State Prison, 92 F.4th 1338, 1342 (11th Cir. 2024) (alteration omitted); see also Maertz Deposition at 18–19.

[6] Deputy Redmond had previously been a part of a CCSO team that had executed a search warrant at the home of Roe's parents. See Redmond Deposition at 10. Due to participating in this prior search, Deputy Redmond was familiar with the area, and "started to recognize where" Roe was leading him. Id. at 29.

[7] A video camera installed at the home of Roe's parents captured some of the events alleged to have occurred. See Video of Arrest (Doc. 107-4; Camera Footage). However, as the Camera Footage is only thirteen-seconds in length, most of the events relevant to this case are not captured.

Deputy Redmond ordered Roe to "turn around, put your hands behind your back," but Roe continued "to walk towards [Deputy Redmond]" with his hands in the air. Roe Deposition at 35; Redmond Deposition at 33.[8] With Roe continuing to advance, and outweighing Deputy Redmond "by 100 pounds," Deputy Redmond kicked Roe in the knee in an attempt to "knock him off balance[.]" Redmond Deposition at 36, 53. After being kicked, Roe's hands "went down towards his waistband, which is a common known area for people to carry firearms," so Deputy Redmond grabbed Roe's shirt and struck him in the face with the flashlight attached to his pistol. Id. at 38–39. Upon being struck, Roe fell to the ground, and Deputy Maertz tackled Roe and began to "continuously" punch him in the face. Response at 3; Roe Deposition at 40. While this was going on, multiple individuals came out from the inside of the house, so Deputy Redmond moved to secure the perimeter and provide "lethal coverage." Redmond Deposition at 41. Meanwhile, Deputy Maertz was able to secure Roe in handcuffs, and once he had secured Roe, stopped punching him. See Roe

---

[8] According to Deputy Redmond, he ordered Roe to get on the ground three times and another officer gave the same command. See Redmond Deposition at 33. Deputy Maertz similarly testified that Deputy Redmond ordered Roe to get on the ground. See Maertz Deposition at 37. But, Roe specifically denies that Deputy Redmond ordered him to get on the ground and testified that Deputy Redmond only told him to "turn around, put your hands behind your back." Roe Deposition at 35. Because the Camera Footage does not have audio, the Court accepts Roe's testimony that the only command he was given by Deputy Redmond was to turn around and put his hands behind his back. See Brooks v. Miller, 78 F.4th 1267, 1271–72 (11th Cir. 2023) ("When the action happens off camera and the audio doesn't clearly contradict the plaintiff's story," the Court must "accept the nonmoving party's version of the facts in determining whether to enter summary judgment").

Deposition at 44. With Roe now in handcuffs, and lying on the ground, Deputy Maertz placed his knee on Roe's neck and back. Id. Roe began to complain to Deputy Maertz that he was having difficulty breathing, but Deputy Maertz told Roe, "shut up, you ain't black, and pushed [with] more force[.]" Id. at 44. After a brief period of time, and being warned that "the occupants of the house were family and they were possibly a threat towards law enforcement[,]" the Deputies picked Roe up from the ground and transported him to a secure location. Maertz Deposition at 34, 45.[9]

## II.   Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other

---

[9] Roe does not know how long Deputy Maertz's knee was on his back and neck, but concedes that it was for a short period of time. See Roe Deposition at 44 ("**Q:** And how long after you were cuffed was it before you got off the ground? **A:** I don't remember. It wasn't too long.").

materials." Rule 56(c)(1)(A).[10] An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant. See Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Est. of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on

---

[10] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 Advisory Committee's Note 2010 Amends.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id. "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive." Campbell v. Shinseki, 546 F. App'x 874, 879 n.3 (11th Cir. 2013). Thus, case law construing the former Rule 56 standard of review remains viable and is applicable here.

file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593–94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; see also McCormick v. City of Ft. Lauderdale, 333 F.3d 1234, 1243 (11th Cir. 2003) ("The mere existence of some factual dispute will not defeat summary judgment unless the factual dispute is material to an issue affecting the outcome of the case."). In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves, 52 F.3d at 921 (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)).

## III.   Discussion

Roe asserts seven claims: (1) excessive force under 42 U.S.C. § 1983 against Sheriff Cook, Deputy Redmond, and Deputy Maertz; (2) failure to intervene under 42 U.S.C. § 1983 against Sheriff Cook, Deputy Redmond, and Deputy Maertz; (3) municipal liability under 42 U.S.C. § 1983 against Sherriff Cook in her official capacity as the Sheriff of Clay County; (4) failure to train and supervise under 42 U.S.C. § 1983 against Sheriff Cook in her official capacity as the Sheriff of Clay County; (5) assault under state law against

Deputy Redmond and Deputy Maertz; (6) battery under state law against Deputy Redmond and Deputy Maertz; and (7) intentional infliction of emotional distress under state law against Deputy Redmond and Deputy Maertz. <u>See</u> Fourth Amended Complaint and Jury Demand at 8–26 (Doc. 89; Fourth Amended Complaint).[11] As to the excessive force claim, Defendants argue that they are entitled to qualified immunity because the force used against Roe did not violate the Fourth Amendment, and that even if it did, this violation had not been clearly established. <u>See</u> Motion at 16, 32. In response, Roe contends that the force used by Defendants was in violation of his Fourth Amendment rights and that this violation was clearly established. <u>See</u> Response at 25. As to the failure to intervene claim, Defendants contend that because they did not violate Roe's Fourth Amendment rights there was no duty to intervene. <u>See</u> Motion at 28. Roe raises no argument in opposition to this contention. As to the municipal liability claims, Sheriff Cook argues that Roe has failed to show that the CCSO can be held liable. <u>Id.</u> at 36. In the Response, Roe concedes that his claims against Sheriff Cook fail and consents to their dismissal. <u>See</u> Response at 1. And, as to the state law claims, the Deputies argue that these claims are barred by statutory sovereign immunity. <u>See</u> Motion at 39. Again, Roe raises no

---

[11] As to the claims brought against Sheriff Cook in her official capacity as the Sheriff of Clay County, "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." <u>Kentucky v. Graham</u>, 473 U.S. 159, 166 (1985). Thus, references to Sheriff Cook in this Order should be construed as referring to the Clay County Sheriff's Office.

argument in opposition to this. For the reasons discussed below, the Court finds that the Motion is due to be granted in-part and denied in-part.

### A.    Excessive Force (Count I)

In Count I, Roe asserts that the Deputies used unconstitutionally excessive force during his arrest. See Fourth Amended Complaint at 8. The Deputies request entry of summary judgment in their favor as to this claim arguing that they are entitled to qualified immunity because their use of force was constitutional as a matter of law, and that even if it was excessive, their conduct was not a clearly established violation of the Constitution at the time of the incident. See Motion at 16, 32.[12]

The doctrine of "[q]ualified immunity protects from civil liability government officials who perform discretionary functions if the conduct of the officials does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Nolin v. Isbell, 207 F.3d 1253, 1255 (11th Cir. 2000) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). As a result, this defense protects from suit "'all but the plainly incompetent or

---

[12] In Count I, Roe also asserts that Sheriff Cook is liable for excessive force under 42 U.S.C. § 1983. See Fourth Amended Complaint at 8. However, Roe consents to the dismissal of Sheriff Cook from Count I, conceding that he is "unable to develop the evidence necessary" to hold Sheriff Cook vicariously liable for the Deputies' conduct. Response at 26 n.1. Accordingly, summary judgment is due to be entered in Sheriff Cook's favor as to Count I of the Fourth Amended Complaint.

those who knowingly violate the law.'"[13] <u>Mullenix v. Luna</u>, 577 U.S. 7, 12 (2015) (quoting <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986)); <u>Carr v. Tatangelo</u>, 338 F.3d 1259, 1266 (11th Cir. 2003). Indeed, as "'[g]overnment officials are not required to err on the side of caution,' qualified immunity is appropriate in close cases where a reasonable officer could have believed that his actions were lawful[.]" <u>Lee v. Ferraro</u>, 284 F.3d 1188, 1200 (11th Cir. 2002) (quoting <u>Marsh v. Butler Cnty.</u>, 268 F.3d 1014, 1031 n.8 (11th Cir. 2001)).

To be entitled to qualified immunity, a defendant bears the initial burden of showing that his conduct was within the scope of his discretionary authority. <u>See</u> <u>Webster v. Beary</u>, 228 F. App'x 844, 848 (11th Cir. 2007); <u>Lee</u>, 284 F.3d at 1194. Here, it is undisputed that, at all times material to this case, the Deputies were acting in their official capacity and within the scope of their discretionary authority.[14] Accordingly, the burden shifts to Roe to demonstrate that qualified

---

[13] In determining whether a defendant is entitled to qualified immunity, courts view the facts and all reasonable inferences in the light most favorable to the plaintiff to the extent supported by the record, and then considers "the legal issue of whether the plaintiff's 'facts,' if proven, show that the defendant violated clearly established law." <u>Priester v. City of Riviera Beach</u>, 208 F.3d 919, 925 n.3 (11th Cir. 2000); <u>Scott v. Harris</u>, 550 U.S. 372, 381 n.8 (2007).

[14] "'A government official acts within [his] discretionary authority if the actions were (1) undertaken pursuant to the performance of [his] duties and (2) within the scope of [his] authority.'" <u>Jones v. City of Atlanta</u>, 192 F. App'x 894, 897 (11th Cir. 2006) (per curiam) (quoting <u>Lenz v. Winburn</u>, 51 F.3d 1540, 1545 (11th Cir. 1995)). Making an arrest is thus a discretionary function for a police officer. <u>See</u> <u>Crosby v. Monroe Cnty.</u>, 394 F.3d 1328, 1332 (11th Cir. 2004); <u>see also</u> <u>Lee</u>, 284 F.3d at 1194 (finding that "there can be no doubt that [the deputy] was acting in his discretionary capacity when he arrested [the plaintiff]," even though the plaintiff asserted that the deputy used excessive force in the manner in which he was arrested).

immunity is not appropriate using the test established by the Supreme Court in <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001).

In accordance with <u>Saucier</u>, the Court must ask whether the facts viewed in the light most favorable to the plaintiff "show the [Deputies'] conduct violated a constitutional right[.]" <u>Id.</u>; <u>see</u> <u>also</u> <u>Hope v. Pelzer</u>, 536 U.S. 730, 736 (2002); <u>Beshers v. Harrison</u>, 495 F.3d 1260, 1265 (11th Cir. 2007) (quoting <u>Scott</u>, 550 U.S. at 377)). The court also must ask whether the right allegedly violated was clearly established at the time of the violation. <u>See</u> <u>Hope</u>, 536 U.S. at 739; <u>Saucier</u>, 533 U.S. at 201; <u>Scott</u>, 550 U.S. at 377; <u>Underwood v. City of Bessemer</u>, 11 F.4th 1317, 1328 (11th Cir. 2021) ("[W]e ask two questions: (1) whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right, and (2) if so, whether the right at issue was clearly established at the time of the defendant's alleged misconduct") (internal quotations omitted). The Court may consider these questions in whichever order it chooses, and qualified immunity will protect the defendant if the answer to either question is "no." <u>Pearson v. Callahan</u>, 555 U.S. 223, 232, 236 (2009);[15] <u>Underwood</u>, 11 F.4th at 1328.

---

[15] In <u>Pearson</u>, the Supreme Court modified the procedure mandated in <u>Saucier</u>, permitting courts the discretion to determine which prong of the qualified immunity analysis should be resolved first. <u>See</u> <u>Pearson</u>, 555 U.S. at 236.

<u>i. Excessive Force</u>

Addressing the first question, the Court must determine whether the Deputies subjected Roe to an unlawful use of force on August 27, 2020. Specifically, the Court must evaluate whether Deputy Redmond used excessive force when he punched Roe in the face with the flashlight attached to his pistol, and whether Deputy Maertz used excessive force when he placed his knee on Roe's neck and back once Roe was secured in handcuffs. In conducting this analysis, the Court heeds the Supreme Court's caution that:

> Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.
>
> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight . . . . With respect to a claim of excessive force, the same standard of reasonableness at the moment

> applies: Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

Graham v. Connor, 490 U.S. 386, 396–97 (1989) (internal citations and quotations omitted); see also Croom v. Balkwill, 645 F.3d 1240, 1251–52 (11th Cir. 2011); Draper v. Reynolds, 369 F.3d 1270, 1277–78 (11th Cir. 2004); Durruthy v. Pastor, 351 F.3d 1080, 1093–94 (11th Cir. 2003). Consistent with this authority, a court uses the (1) severity of the crime, (2) danger to officer safety, and (3) risk of flight, referred to as the Graham factors, to analyze the reasonableness of an officer's use of force. See Lee, 284 F.3d at 1198. Indeed, "Graham dictates unambiguously that the force used by a police officer in carrying out an arrest must be reasonably proportionate to the need for that force, which is measured by the severity of the crime, the danger to the officer, and the risk of flight." Id.; see also Taylor v. Taylor, 649 F. App'x 737, 746 (11th Cir. 2016). Significantly, "an officer will be entitled to qualified immunity . . . if an objectively reasonable officer in the same situation could have believed that the force used was not excessive." Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002).

As to the first <u>Graham</u> factor—the severity of the crime at issue—Roe concedes that this factor favors the Deputies. <u>See</u> Response at 20. And rightly so, considering that Roe was wanted for murder. Accordingly, this factor weighs in favor of the Deputies.

The second <u>Graham</u> factor—the danger to officers or others—also supports the reasonableness of the Deputies' conduct. Roe contends that "he posed no immediate threat to the safety of Deputies Redmond, Maertz, or other law enforcement personnel in the area." <u>Id.</u> The Court is not convinced. As an initial matter, the Court notes that when the Deputies attempted to arrest Roe using a pre-planned felony traffic stop, Roe fled from the Deputies at a high rate of speed. As explained by the Supreme Court, "[t]he attempt to elude capture is a direct challenge to an officer's authority. It is a provocative and dangerous act that dares, and in a typical case requires, the officer to give chase." <u>Sykes v. United States</u>, 564 U.S. 1, 9 (2011), <u>overruled on other grounds</u>, <u>Johnson v. United States</u>, 576 U.S. 591, 606 (2015). And give chase is what the Deputies did. However, Roe continued to flee until Deputy Redmond struck Roe's vehicle in the driveway of his parent's home. Notably, Roe was reported to be a member of the Aryan Brotherhood, was known to carry firearms on his person and in his vehicle, and was wanted for a murder accomplished by beating the victim to death. And, once stopped, Roe, a man much larger than Deputy Redmond, immediately got out of his vehicle and began walking toward Deputy Redmond.

Although Roe initially had his hands in the air, Roe's hands quickly went toward his waistband, leading Deputy Redmond to believe that Roe was attempting to reach for a weapon.[16]  Based upon these facts, a reasonable officer certainly could believe that Roe's behavior constituted a threat to officer safety. Accordingly, the Court finds that this factor weighs in the Deputies' favor.

The third Graham factor—whether the suspect is actively resisting arrest or attempting to evade arrest by flight—also supports the reasonableness of the Deputies' conduct. Roe contends that this factor weighs in his favor because he "was neither resisting arrest nor fleeing when the Deputies punched [him] with the pistol, and applied pressure on [his] neck and back." Response at 22. This argument is unavailing. As noted above, Roe fled from the Deputies at a high rate of speed when they attempted to pull him over.[17]  Once stopped in his parent's driveway, Roe immediately got out of his vehicle and began walking

---

[16] Roe, citing to a report prepared by his proffered expert, Thomas J. Tiderington, contends that he "signaled his surrender to [the] officers by raising his hands in the air, which should have signified a cessation of resistance and an indication of compliance with law enforcement." See Expert Report of Thomas J. Tiderington at 17 (Doc. 110-5; Tiderington Opinion). This argument, however, completely ignores the fact that Roe continued walking toward Deputy Redmond, ignored Deputy Redmond's command to turn around, and abruptly lowered his hand toward his waistband.

[17] Without citing any legal authority, Roe contends that his attempt to flee from the Deputies is "irrelevant" as the Court should not consider what "did or did not occur prior to [him] arriving at the arrest site[.]" Response at 21. This argument is entirely unconvincing. As explained by the Supreme Court, "Graham commands that an officer's use of force be assessed for reasonableness under the 'totality of the circumstances.'" Cnty. of Los Angeles, Calif. v. Mendez, 581 U.S. 420, 429 n.* (2017) (quoting Graham, 490 U.S. at 396)). And Roe's attempt to flee is certainly a consideration that factors into this calculus.

toward Deputy Redmond. Roe had his hands in the air, but Deputy Redmond observed Roe move them toward his waistband. Based on the facts known to the Deputies, a reasonable officer could believe that Roe was attempting to evade arrest by flight when he fled from the Deputies during the felony traffic stop. A reasonable officer also could believe that Roe was attempting to resist arrest when he failed to turn around, continued walking toward Deputy Redmond, and appeared to reach for his waistband. Therefore, this factor weighs in the Deputies' favor.

Accordingly, all three <u>Graham</u> factors—the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others, and whether the suspect is attempting to resist arrest or evade capture by flight—weigh in favor of finding the Deputies' use of force to be reasonable. The Court does not end its inquiry there, however. The Eleventh Circuit also instructs district courts to consider three other factors: "(1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted[.]" <u>Lee</u>, 284 F.3d at 1197–98. The Court refers to these as "the <u>Lee</u> factors."

The first <u>Lee</u> factor—the need for the application of force—is answered by the <u>Graham</u> factors themselves. Roe's decision to flee from the Deputies and lead them on a high-speed chase, and his decision to get out of his vehicle and quickly approach Deputy Redmond, show that some level of force was needed

to gain control of the situation. Additional force was then required for the Deputies to ensure that Roe was safely placed in handcuffs. Accordingly, this factor weighs in the Deputies' favor.

The second <u>Lee</u> factor—the relationship between the need and amount of force used—weighs in the Deputies' favor as well. As a threshold matter, "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." <u>Id.</u> at 1197 (quoting <u>Graham</u>, 490 U.S. at 396). Therefore, "the typical arrest involves some force and injury." <u>Rodriguez v. Farrell</u>, 280 F.3d 1341, 1351 (11th Cir. 2002) (citing <u>Nolin</u>, 207 F.3d at 1257–58)). And a "constitutional violation only occurs when the officer's use of force is 'objectively unreasonable' in light of the totality of the circumstances at the time the force is used." <u>Glover v. Eighth Unknown D.E.A. Agents/Drug Task Force Agents From Birmingham, Alabama Task Force</u>, 225 F. App'x 781, 785–86 (11th Cir. 2007) (quoting <u>Graham</u>, 490 U.S. at 397)). As Roe was subjected to separate uses of force by Deputy Redmond and Deputy Maertz, the Court will discuss each one in turn.

<u>Deputy Redmond</u>. During Roe's arrest, Deputy Redmond used a leg strike on Roe's knee, grabbed Roe by the shirt, and struck Roe in the face with the flashlight attached to his pistol. As explained by the Eleventh Circuit, "[b]ecause a police officer is entitled to use some force to arrest a suspect, 'the

application of de minimis force, without more, will not support a claim for excessive force in violation of the Fourth Amendment.'" Myers v. Bowman, 713 F.3d 1319, 1327 (11th Cir. 2013) (quoting Nolin, 207 F.3d at 1257)). Here, after fleeing from a lawful arrest, Roe got out of his vehicle, and began walking toward Deputy Redmond with his hands in the air. Deputy Redmond used a leg strike on Roe's knee, and observing Roe reach for his waistband, grabbed Roe by the shirt and struck him in the face. Under these circumstances, Deputy Redmond's use of force was de minimis. See Nolin, 207 F.3d at 1255 (finding the force used to be de minimis when the officer "grabbed [the plaintiff] from behind by the shoulder and wrist, threw him against a van three or four feet away, [and] kneed him in the back and pushed his head into the side of the van[.]"); Woodruff v. City of Trussville, 434 F. App'x 852, 855 (11th Cir. 2011) ("The kind of force alleged by [the plaintiff]—including [the officer] punching [the plaintiff] in the face, forcefully removing him from his car, and slamming him on the ground . . . constituted only de minimis force."). Even if the force used was not de minimis, Deputy Redmond was entitled to use some level of force to safely secure Roe, and a reasonable officer could believe that the strikes to Roe's knee and face were proportionate to this need. See Brown v. City of Huntsville, Ala., 608 F.3d 724, 740 (11th Cir. 2010) ("For even minor offenses, permissible force includes physical restraint, use of handcuffs, and pushing into walls."). Thus, the Court finds that Deputy Redmond's use of force was objectively reasonable.

_Deputy Maertz_. During Roe's arrest, Deputy Maertz placed his knee on Roe's neck and back while Roe was on the ground secured in handcuffs.[18] Considering that multiple individuals who were thought to be hostile toward law enforcement had arrived on the scene, and the scene had not yet been fully secured, a reasonable officer could believe that this brief use of force was necessary to ensure that Roe was immobilized until he could be transported to a safe location. See Croom v. Balkwill, 645 F.3d 1240, 1252 (11th Cir. 2011) (finding the force used to be de minimis when the officer placed his knee on the plaintiff's back for ten minutes); Bolton v. Wood, 682 F. Supp. 3d 1304, 1322 (N.D. Ga. 2023) (collecting cases) ("Even if [the deputy] placed his foot and/or knee on [the plaintiff's] neck as well as his back, this would still not rise above de minimis force because the Eleventh Circuit has upheld similar (and much more severe) acts as de minimis and not violative of the Fourth Amendment."). Thus, the Court finds that Deputy Maertz's use of force was objectively reasonable.[19]

---

[18] Although there is some evidence in the record that Deputy Maertz punched Roe while he was on the ground, Roe fails to argue that these punches constituted excessive force. Instead, the only force that Roe identifies as being excessive is that "there was absolutely no need to punch Mr. Roe in the face with a pistol and/or apply pressure from the knee to Mr. Roe's neck and back." See Response at 22–23; id. at 24 (same); id. at 25 ("Deputies Redmond and Maertz punched Mr. Roe in the face with Redmond's pistol, and used Maertz's knee to apply pressure to Mr. Roe's neck and back, interfering with his breathing[.]"). Because Roe fails to argue that Deputy Maertz's strikes were excessive, the Court will not make this argument on his behalf, and does not address this issue.

[19] Relying on Tiderington's opinion, Roe contends that there was no need for the Deputies' use of force as there was "no reasonable chance [that Roe could] avoid apprehension."

In sum, the Court finds that the Deputies' use of force was proportionate to the need to place Roe, an individual known to be dangerous and wanted for murder, under arrest. Accordingly, this factor weighs in favor of the Deputies.

The third <u>Lee</u> factor—the extent of the injury inflicted—is likely neutral. Even if not life threatening, Roe appears to have suffered a fracture to his right orbital, multiple fractured teeth, and injuries to his neck and face. <u>See</u> Roe Deposition at 54, 62–66. That said, the evidence does not suggest that Roe's injuries were greater than what was needed for the Deputies to ensure his compliance. Thus, on balance, this factor is likely neutral.

Upon consideration of the record, and construing all disputed facts and inferences in Roe's favor, Roe fails to create a genuine issue for trial on the question of whether the Deputies' use of force was objectively unreasonable. Given that Roe was wanted for, amongst the most serious of crimes, murder, was known to be armed and dangerous, had fled from the police, and had quickly approached Deputy Redmond, the Deputies reasonably could have believed that their use of force was necessary to safely effect the arrest of Roe. The Court thus determines that Roe has failed to show a genuine issue of fact for trial on his claim against the Deputies. Therefore, the Deputies are entitled

---

Tiderington Opinion at 17. A reasonable officer, however, is not required to assume that a cornered suspect will behave reasonably. Indeed, under the circumstances of this case, the Deputies "had no reason to trust that [Roe] would not suddenly attempt to do [them] harm." <u>Crenshaw v. Lister</u>, 556 F.3d 1283, 1293 (11th Cir. 2009) (footnote omitted).

to qualified immunity and summary judgment is due to be entered in their favor as to Count I of the Fourth Amended Complaint. See Vinyard, 311 F.3d at 1346 ("An officer will be entitled to qualified immunity . . . if an objectively reasonable officer in the same situation could have believed that the force used was not excessive.").

### ii. Clearly Established

Even if the Court were to find that the force used by the Deputies was unconstitutionally excessive, Roe fails to point to authority supporting a conclusion that they violated a clearly established constitutional right. See Kingsland v. City of Miami, 382 F.3d 1220, 1232 (11th Cir. 2004), abrogated on other grounds by Williams v. Aguirre, 965 F.3d 1147 (11th Cir. 2020). As the Supreme Court has explained:

> For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent."

Hope, 536 U.S. at 739 (citation omitted) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). For purposes of this analysis, the critical question is whether the state of the law gave the government actor "fair warning" that his alleged treatment of the plaintiff was unconstitutional. Vinyard, 311 F.3d at 1350 (quoting Hope, 536 U.S. at 741); see also Marsh, 268 F.3d at 1031 ("[F]air

and clear notice to government officials is the cornerstone of qualified immunity[.]"). The Eleventh Circuit recognizes three sources of law that would provide a government official adequate notice of statutory or constitutional rights: "specific statutory or constitutional provisions; principles of law enunciated in relevant decisions; and factually similar cases already decided by state and federal courts in the relevant jurisdiction." Harper v. Lawrence County, Ala., 592 F.3d 1227, 1233 (11th Cir. 2010) (quoting Goebert v. Lee County, 510 F.3d 1312, 1330 (11th Cir. 2007)). Thus, where the words of the federal statute or federal constitutional provision are specific enough "to establish clearly the law applicable to particular conduct and circumstances," then the plaintiff can overcome the qualified immunity privilege, even in the absence of case law. Vinyard, 311 F.3d at 1350. In this type of "obvious clarity" case, "the words of the federal statute or federal constitutional provision may be so clear and the conduct so bad that case law is not needed to establish that the conduct cannot be lawful." Id.

Alternatively, where the conduct alleged is not so egregious as to violate a statutory or constitutional right on its face, courts look to case law to determine whether the law is "clearly established." Id. at 1351. If the case law contains "some broad statements of principle" which are "not tied to particularized facts," then it may be sufficient to clearly establish the law applicable in the future to different facts. Id. However, to provide officials with

sufficient warning, the case law must establish a principle with such "obvious clarity" that "every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." Id. Last, in the absence of broad statements of principle, precedent can clearly establish the applicable law where "the circumstances facing a government official are not fairly distinguishable, that is, are materially similar," to the particularized facts of prior case law. Id. at 1352. Such precedent must be found in decisions from the Supreme Court, the controlling circuit court of appeals, or the pertinent state supreme court. Id. at 1351. Although such a case "on all fours" with materially identical facts is not required to establish "fair warning" to government officials, see Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1277 (11th Cir. 2004) (discussing the impact of Hope on Eleventh Circuit precedent), "existing precedent must have placed the statutory or constitutional question beyond debate." See Mullenix, 577 U.S. at 12 (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011)).

In his Response, Roe fails to identify a single case standing for the proposition that the Deputies' use of force under the circumstances here was clearly excessive. Instead, he relies only on the general proposition that when "law enforcement uses excessive force when making an arrest, it violates the arrestee's Fourth Amendment rights." Response at 24 (citing Graham, 490 U.S. at 396). In the absence of Roe citing any case law to the contrary, the Court

finds that a reasonable officer would not have been on notice that the Deputies' use of force was unconstitutional. <u>See</u> <u>Priester</u>, 208 F.3d at 926 ("[U]nless a controlling and materially similar case declares the official's conduct unconstitutional, a defendant is usually entitled to qualified immunity."). Moreover, this is not the sort of case where it is apparent, with "obvious clarity," that the Deputies' conduct was unconstitutional. <u>See</u> <u>Vinyard</u>, 311 F.3d at 1350. In the face of an individual who is wanted for murder, is known to be armed and dangerous, has fled from the police, and is approaching an officer in violation of the officer's order, it cannot be said that the use of force in the manner shown here to apprehend that individual is so clearly excessive as to warrant the denial of qualified immunity in the absence of any case law. For these reasons, even if Roe could show the violation of a constitutional right, he has not shown that this right had been clearly established.

## B.    Failure to Intervene (Count II)

In Count II, Roe asserts a claim against the Deputies for failure to intervene under 42 U.S.C. § 1983. <u>See</u> Fourth Amended Complaint at 12–16.[20] Specifically, Roe contends that Deputy Maertz is liable for failing to prevent

---

[20] In Count II, Roe also asserts that Sheriff Cook is liable for failing to intervene under 42 U.S.C. § 1983. <u>See</u> Fourth Amended Complaint at 12. However, Roe consents to the dismissal of Sheriff Cook from Count II, conceding that he is "unable to develop the evidence necessary" to hold Sheriff Cook vicariously liable for the Deputies' conduct. Response at 26 n.1. Accordingly, summary judgment is due to be entered in Sheriff Cook's favor as to Count II of the Fourth Amended Complaint.

Deputy Redmond from striking him in the face with the flashlight attached to his pistol. Id. And that Deputy Redmond is liable for failing to prevent Deputy Maertz from kneeling on his neck and back. Id. The Deputies move for the entry of summary judgment arguing that they had no duty to intervene because the force used against Roe was not excessive. See Motion at 29–31. Roe fails to raise any argument in response to this contention. Generally, an officer may be "held liable under § 1983, even if he did not use excessive force himself, if he was 'present at the scene and . . . fail[ed] to take reasonable steps to protect the victim of another officer's use of excessive force.'" Hunter v. Leeds, City of, 941 F.3d 1265, 1282 (11th Cir. 2019) (quoting Hadley v. Gutierrez, 526 F.3d 1324, 1330 (11th Cir. 2008)). "To be held liable on a theory of nonfeasance, the officer must have been in a position to intervene but failed to do so." Id. (citing Priester, 208 F.3d at 924). However, "an officer cannot be liable for failing to stop or intervene when there was no constitutional violation being committed." Sebastian v. Ortiz, 918 F.3d 1301, 1312 (11th Cir. 2019). Summary judgment is therefore warranted "for the remaining officers who did not participate directly in the arrest because a police officer has no duty to intervene in another officer's use of force when that use of force is not excessive." Mobley v. Palm Beach Cnty. Sheriff Dep't, 783 F.3d 1347, 1357 (11th Cir. 2015). Because the Court has already found that summary judgment is due to be entered in the Deputies' favor as to Roe's excessive force claim, the Court necessarily finds that neither

Deputy Redmond nor Deputy Maertz had a duty to intervene. See Mobley, 783 F.3d at 1357. Accordingly, summary judgment is due to be entered in the Deputies' favor as to Count II of the Fourth Amended Complaint.

### C.     Monell Liability (Counts III and IV)

In Counts III and IV, Roe asserts claims against Sheriff Cook, in her official capacity as the Sheriff of Clay County, for (1) municipal liability under 42 U.S.C. § 1983 and (2) failure to train and supervise under 42 U.S.C. § 1983. See Fourth Amended Complaint at 16–22. Roe consents to the dismissal of these claims, conceding that he is "unable to develop the evidence necessary" to hold Sheriff Cook liable. Response at 26 n.1. Accordingly, summary judgment is due to be entered in Sheriff Cook's favor on Counts III and IV of the Fourth Amended Complaint.

### D.     State Law Claims (Counts V, VI, and VII).

Having determined that summary judgment is due to be granted in favor of Defendants as to Roe's federal claims, the Court next considers whether to continue to exercise supplemental jurisdiction over Roe's remaining state law claims. At the time the instant case was filed, the Court had original jurisdiction over the federal claims, see 28 U.S.C. § 1331, as well as supplemental jurisdiction over Roe's state law claims, see 28 U.S.C. § 1367(a). See United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 725 (1966). However, § 1367(c)(3) gives a court discretion to dismiss or remand to state court claims before it on

the basis of supplemental jurisdiction if "the district court has dismissed all claims over which it has original jurisdiction[.]" 28 U.S.C. § 1367(c)(3). Indeed, the Eleventh Circuit has held that a district court may properly decline to exercise jurisdiction over supplemental state law claims when the federal claims over which the Court had original jurisdiction are dismissed on a motion for summary judgment, as is the case here. See Murphy v. Fla. Keys Elec. Co-op Ass'n, Inc., 329 F.3d 1311, 1320 (11th Cir. 2003) (affirming summary judgment on defendant's contribution claim invoking admiralty jurisdiction, and affirming dismissal of third-party defendant's state law counterclaim under 28 U.S.C. § 1367(c)); Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999) ("If no federal claim survives summary judgment, the court sees no reason why the other claims should not be dismissed or remanded pursuant to 28 U.S.C. § 1367(c)(3)."); Eubanks v. Gerwen, 40 F.3d 1157, 1162 (11th Cir. 1994) (stating that since the "federal claims [had] been disposed of rather early on at the summary judgment phase[,] . . . comity suggests that the remaining state law malicious prosecution claim should be heard in state court"); see also Maschmeier v. Scott, 508 F. Supp. 2d 1180, 1185–86 (M.D. Fla. 2007) (declining to exercise supplemental jurisdiction over the plaintiff's state law claim after granting summary judgment in favor of the defendant on the plaintiff's federal claims).

In deciding whether to exercise supplemental jurisdiction over state law

claims, district courts consider "the circumstances of the particular case, the nature of the state law claims, the character of the governing state law, and the relationship between the state and federal claims[,]" as well as "the values of judicial economy, convenience, fairness, and comity." City of Chicago v. Int'l Coll. of Surgeons, 522 U.S. 156, 173 (1997) (internal quotations omitted) (citing Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988)). "When the balance of these factors indicates that a case properly belongs in state court, as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice." Cohill, 484 U.S. at 350 (citing Gibbs, 383 U.S. at 726–27) (footnote omitted); Gibbs, 383 U.S. at 726 ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."); see also Raney v. Allstate Ins. Co., 370 F.3d 1086, 1089 (11th Cir. 2004) (stating that the Eleventh Circuit has "encouraged district courts to dismiss any remaining state claims when . . . the federal claims have been dismissed prior to trial") (citing L.A. Draper & Son v. Wheelabrator-Frye, Inc., 735 F.2d 414, 428 (11th Cir. 1984)). Notably, the Supreme Court's directive in Cohill concerning when a district court should decline to continue to exercise supplemental jurisdiction "was not intended to 'establish a mandatory rule to be applied inflexibly in all cases,'" but "it did establish a general rule to be

applied in all but extraordinary cases." Carr v. Tatangelo, 156 F. Supp. 2d 1369, 1380 (M.D. Ga. 2001) (citing Cohill, 484 U.S. at 350 n.7), aff'd, 338 F.3d 1259 (11th Cir. 2003). Moreover, because "[s]tate courts, not federal courts, should be the final arbiters of state law," dismissal of state law claims is strongly encouraged when federal claims are dismissed prior to trial. Baggett v. First Nat'l Bank of Gainesville, 117 F.3d 1342, 1353 (11th Cir. 1997).

Here, the Court has determined that summary judgment in favor of Defendants is proper with regard to Roe's federal claims. Because the federal claims have been dismissed prior to trial, the Court has the authority under § 1367(c) to decline to retain jurisdiction over the remaining state law claims. See Murphy, 329 F.3d at 1320; Carr, 156 F. Supp. 2d at 1380 (dismissing state law claims without prejudice after finding the defendants to be entitled to qualified immunity as to the federal claims and noting that it is preferable for state courts to "make rulings on issues of [state] law"). As such, the Court declines to continue to exercise supplemental jurisdiction over Counts V, VI, and VII of the Fourth Amended Complaint, and these counts are due to be dismissed without prejudice.

## IV.   Conclusion

Upon consideration of the record and the parties' arguments, the Court makes the following findings. As to Count I, a reasonable officer in the Deputies' position could have believed that the force used against Roe was reasonable,

and even if the force used was excessive, Roe has failed to show that the unreasonableness of such force had been clearly established. Thus, the Deputies are entitled to qualified immunity and summary judgment is due to be entered in their favor on Count I. As to Count II, the Deputies are entitled to summary judgment because they did not have a duty to intervene to prevent the force used against Roe. As to Counts III and IV, because Roe consents to the dismissal of these claims, summary judgment is due to be entered in Sheriff Cook's favor on these Counts. Finally, the Court declines to exercise supplemental jurisdiction over Roe's state law claims, Counts V, VI, and VII, and these claims are due to be dismissed without prejudice.

Accordingly, it is

**ORDERED:**

1. Defendants' Motion for Summary Judgment, Statement of Facts, and Memorandum of Law (Doc. 106) is **GRANTED in-part** and **DENIED in-part**.

   A. The Motion is **granted** with respect to Counts I, II, III, and IV of the Fourth Amended Complaint, and the Clerk of the Court is directed to enter **JUDGMENT** in favor of Defendants Sheriff Michelle Cook, Deputy Clint Redmond, and Deputy Mark Maertz and against Plaintiff Travis Roe as to Counts I and II, and in favor of Defendant Sheriff Michelle Cook as to Counts III and IV.

B. The motion is **denied** as to Counts V, VI, and VII of the Fourth Amended Complaint. In the exercise of its discretion under 28 U.S.C. § 1367(c), the Court declines to continue to exercise jurisdiction over these claims, and Counts V, VI, and VII are **dismissed without prejudice** to Roe refiling these claims in state court if he so chooses.

2. The Clerk of the Court is further **directed** to terminate any pending motions and deadlines as moot and to close the file.

**DONE AND ORDERED** in Jacksonville, Florida this 25th day of October, 2024.

*Marcia Morales Howard*
**MARCIA MORALES HOWARD**
United States District Judge

Lc32

Copies to:
Counsel of Record